# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC,<br><br>      Plaintiff,<br><br>v.<br><br>THE INDIVIDUALS, CORPORATIONS, LIMITED LIABILITY COMPANIES, PARTNERSHIPS, AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE A TO THE COMPLAINT,<br><br>      Defendants. | Civil Action No. |

## COMPLAINT

Plaintiff, National Association for Stock Car Auto Racing, LLC, ("Plaintiff" or "NASCAR") files this Complaint against Defendants, as identified in Schedule A hereto (collectively, "Defendants") and alleges as follows:

## I. Introduction

This trademark infringement action is part of NASCAR's continuing efforts to safeguard its goodwill and trademarks against persistent online infringement by foreign-based counterfeiters and infringers.

## II. Jurisdiction and Venue

1. This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq*. The Court has federal question jurisdiction over this action under 15 U.S.C. § 1121, 28 U.S.C. § 1338(a) and (b), and 28 U.S.C. § 1331.

1

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to these claims occurred here and because defendants are subject to this Court's personal jurisdiction.

3.     This Court may properly exercise personal jurisdiction over Defendants pursuant to North Carolina's long-arm statute, N.C. Gen. Stat. §1-75.4 *et seq*., and Federal Rule of Civil Procedure 4(k)(2) since each of the Defendants directly targets consumers in the United States, including North Carolina, through means including, but not necessarily limited to, the fully interactive commercial internet stores operating under the Defendant aliases and/or the online marketplace accounts identified in Schedule A attached hereto (collectively, the "Seller Aliases"). Further, upon information and belief, Defendants are not subject to jurisdiction in any state court of general jurisdiction

4.     Specifically, Defendants are affirmatively seeking to do business with North Carolina residents by operating one or more commercial, interactive internet stores through which North Carolina residents can purchase products bearing, or promoted through use of, infringing versions of Plaintiff's federally registered trademarks.

5.     Each of the Defendants has targeted North Carolina residents by operating online stores that offer shipping to the United States, including the Western District of North Carolina, accept payment in U.S. dollars and, on information and belief, have sold products using infringing versions of Plaintiff's federally registered trademarks to residents of North Carolina. Each of the Defendants is committing tortious acts in North Carolina, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the State of North Carolina.

2

### III. <u>Parties</u>

6.     NASCAR is a Florida limited liability company organized under the laws of the State of Florida with its principal place of business at One Daytona Boulevard, Daytona Beach, Florida 32114.

7.     Founded in 1948, NASCAR is the foremost stock car and stock truck racing sanctioning body in North America. Each year, NASCAR sanctions over 1,500 races at over 100 tracks in 48 U.S. states, as well as in Canada, Mexico, Brazil, and Europe.

8.     The sport of stock car racing traces its roots to North Carolina, the first NASCAR Strictly Stock race taking place at Charlotte Speedway June 19, 1949, building upon the popularity of dirt track races occurring throughout North Carolina in the 1940's. A vast majority of NASCAR teams are currently headquartered in and around the metropolitan Charlotte area.

9.     In addition to providing entertainment services, through its affiliates and partners (including its partner Fanatics, which operates the NASCAR Shop depicted below), NASCAR sells, markets, designs, distributes, and licenses NASCAR-branded products worldwide (the "NASCAR Products").



10.     Authorized NASCAR Products available for sale online at https://store.nascar.com/ include the following:

- Apparel & Wearable Merchandise: T-shirts and Tees, Hoodies, Sweatshirts, Fleece, Racing-themed Jackets, Jerseys & Fan Uniform Shirts, Hats & Caps, Polos, Button-downs, Shorts, Pants, Tank Tops, Socks & Footwear, Dresses & Skirts, Pit Crew Shirts & Outerwear, Licensed Driver/Team Jackets and Apparel

- Official NASCAR diecast cars: diecast cars and replicas licensed with real team colors & sponsor logos

- Collectibles & Memorabilia: Plaques and framed photos, Trading cards and card sets, Bobbleheads & figurines, Display cases for diecasts, Wall art/posters/prints, Commemorative plaques, Autographed memorabilia

- Accessories & Fan Gear: Flags & Banners, Tailgating gear (coolers, chairs, etc.), Wallets, belt buckles, keychains, Watches (via license partners), Lanyards & decals/stickers, Sunglasses and casual accessories

- Home & Office: Mugs, Drinkware, Tumblers, Coasters and bar accessories, Clocks and wall signage, Furniture/lamps, Blankets/Throws/Bedding/Pillows

- Kids & Youth Merchandise: Youth clothing (tees, hoodies, hats), Onesies/toddlers' apparel, Toys

- Gifts & Seasonal Items: Stocking stuffers, Gift sets, Christmas-themed NASCAR apparel

- Race-Event & Series Specific Gear: Daytona 500 merchandise, NASCAR All-Star Race gear, Anniversary/throwback collections, Track-specific team gear (e.g., Darlington, Chicago).

11. The United States Patent and Trademark Office has granted Plaintiff registrations for NASCAR's trademarks in connection with both goods and services. The NASCAR

4

Trademarks include, but are not limited to, the below U.S. Reg. Nos. 1,908,112; 5,388,088; 5,578,788; and 6,196,869. *See* Exhibit 1.

| Trademark | Registration No. | Goods Covered |
|---|---|---|
| NASCAR | 1,908,112 | CLASS 6: common metals; namely, key chains, license plates and pins;<br><br>CLASS 9: scientific apparatus; namely, sunglasses and walkie talkies;<br><br>CLASS 14: precious metals; namely, silver medallions, bronze medallions and wrist watches;<br><br>CLASS 16: Paper articles, namely, bumper stickers, calendars, display counter units for trading cards, decals, pens, mounted and unmounted photographs, notebooks, trading cards and laminated signs;<br><br>CLASS 18: leather and leather imitations; namely, back packs, credential holders, wallets, fanny packs;<br><br>CLASS 21: household utensils; namely, mugs, shot glasses, drinking glasses and plastic sport bottles;<br><br>CLASS 24: textile goods; namely, beach towels, blankets; cloth banners;<br><br>CLASS 25: clothing; namely, caps, baseball hats, sweat shirts, sweat pants, footwear, golf shirts, jackets, knit caps, pants, vests, shorts, straw hats, sweaters, tank tops, T-shirts and visors<br><br>CLASS 28: games and playthings; namely, board games, die cast miniature cars, die cast miniature trucks, plush stuffed animals; |

| Trademark | Registration No. | Goods Covered |
|---|---|---|
| | | CLASS 30: edible goods; namely, chocolate candy bars and cookies |
| | 5,388,088 | CLASS 25: Clothing, namely, caps, hats, baseball hats, straw hats, visors, tops, collared shirts, sport shirts, golf shirts, t-shirts, tank tops, sweaters, sweat shirts, jackets, coats, rainwear, sweat pants, pants, shorts, nightgowns, pajamas, robes, vests, socks, belts, shoes, and footwear |
| | 5,578,788 | CLASS 25: Clothing, namely, caps, hats, baseball hats, headwear, visors, tops, collared shirts, sports shirts, golf shirts, t-shirts, tank tops, sweaters, sweat-shirts, jackets |
| | 6,196,869 | CLASS 25: Clothing, namely, caps, hats, baseball hats, headwear, visors, tops, collared shirts, sports shirts, golf shirts, t-shirts, tank tops, sweaters, sweat-shirts, jackets; CLASS 41: Entertainment services, namely, conducting motorsports racing events; regulating, governing, and sanctioning motorsports racing events; providing an online database featuring news and information regarding motorsports via computer information networks, global networks and wireless networks; entertainment services, namely, programs featuring motorsports racing and news, information, and developments regarding motorsports racing, all rendered through television and radio; |

12. As a result of Plaintiff's substantial expenditures of time, money, and other resources developing, advertising, and otherwise promoting quality authorized goods and services in association with the NASCAR Trademarks, products branded with or associated with the

NASCAR Trademarks are recognized and exclusively associated by consumers, the public, and the trade as being products originating from NASCAR.

13. The NASCAR Trademarks are distinctive and serve as source-identifiers for NASCAR's goods and services in the marketplace. NASCAR's Registrations constitute *prima facie* evidence of the validity of the NASCAR Trademarks and NASCAR's exclusive right to use the NASCAR Trademarks pursuant to 15 U.S.C. § 1057 (b).

14. NASCAR's Registrations are valid, well-known, subsisting and in full force, and serve as *prima facie* evidence of Plaintiff's exclusive rights in and to the NASCAR Trademarks.

15. Additionally, many of the NASCAR Trademarks have been used in commerce continuously for more than five consecutive years since being registered and have never been abandoned. Those marks are, therefore, incontestable pursuant to 15 U.S.C. § 1065.

16. Prior to the commencement of Defendants' infringing conduct alleged herein, the NASCAR Trademarks achieved fame within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), as NASCAR is recognized as a household name across the United States and worldwide.

17. True and correct copies of registration certificates for the NASCAR Trademarks are attached as Exhibit 1.

18. The NASCAR brand of products, distributed, and/or licensed by NASCAR, has expanded beyond entertainment services to cover a variety of goods, including toys, apparel, collectibles and the like. Plaintiff, through its duly authorized licensees, is the official source of all such NASCAR Products.

19. NASCAR has made considerable efforts to protect its interests in and to the valuable NASCAR Trademarks. No one other than NASCAR and its licensees are authorized to

7

manufacture, import, export, advertise, offer for sale, or sell any goods utilizing the NASCAR Trademarks without NASCAR's explicit authorization.

20.     Upon information and belief, Defendants are individuals and business entities who reside in various foreign jurisdictions. Defendants conduct business throughout the United States, including within North Carolina and in this judicial district, through the operation of the fully interactive commercial websites and online marketplaces operating under the Seller Aliases. Each Defendant targets the United States, including North Carolina, and has sold, offered to sell, or is currently selling unauthorized and infringing versions of the NASCAR Products to consumers within the United States, including North Carolina and in this judicial district.

## IV. Factual Background

21.     Prior to the proliferation of anonymous online marketplaces, Plaintiff successfully enforced its intellectual property rights against identifiable infringers and counterfeiters through traditional legal methods. The cumulative effect of the mass counterfeiting that is taking place has overwhelmed Plaintiff and its ability to police and enforce its rights against the hundreds of anonymous defendants who are selling illegal counterfeit and infringing NASCAR products (the "Infringing Products") at prices often well below the cost of Plaintiff's authentic NASCAR goods:

**PLAINTIFF'S AUTHORIZED USE OF NASCAR TRADEMARKS**
**(EXAMPLES)**



## COUNTERFEIT/INFRINGING LISTINGS

[REMOVED FROM PUBLIC DOCKET]

22.     The examples of Infringing Products depicted above are taken from Exhibit 2 to this Complaint. The Infringing Product listings depicted above and numerous others presented in the attached Exhibit 2 demonstrate the existence of a cooperative counterfeiting network using fake e-commerce storefronts designed to give the impression that they are selling authorized products.

23.     As shown above and in Exhibit 2, Defendants also sometimes intentionally blur the NASCAR Trademarks displayed on their products in effort to evade Plaintiff's enforcement efforts.

24.     To advance their objective of illegally profiting from NASCAR Trademarks and NASCAR'S brand goodwill, Defendants have created numerous Seller Aliases and have designed their product listings to appear to consumers to be offering authorized NASCAR Products.

25. Defendants use the NASCAR Trademarks on Infringing Products in direct competition with Plaintiff's authorized NASCAR Products. Plaintiff's NASCAR Trademarks cover many classes of goods similar to or the same as the types of products sold by Defendants.

26. Defendants use the NASCAR Trademarks on their product listings (in the title or description), and/or on the product for sale itself.

27. Defendants' systematic and coordinated mass counterfeiting and infringement campaign has caused, and continues to cause, substantial and irreparable harm to Plaintiff and its ability to police and enforce its rights against the hundreds, if not thousands, of anonymous online sellers who are selling counterfeit and infringing products.

28. Offering Infringing Products at a price substantially below the cost of Plaintiff's authentic goods, while still making a profit after absorbing the cost of manufacturing, advertising, and shipping requires an economy of scale is only achievable through a cooperative effort throughout the Defendants' supply chain. As Homeland Security's report confirms, infringers act in concert through coordinated supply chains and distribution networks to unfairly compete with legitimate brand owners while generating huge profits for the illegal pirating network.[1]

29. The Seller Aliases share distinctive identifying characteristics and patterns of conducting business, including use of identical design elements and similarities in the unauthorized products offered for sale, establishing the existence of a coordinated network of related operations arising from the same series of transactions or occurrences.

30. Defendants deliberately employ sophisticated technological means and aliases to evade detection and liability by systematically concealing their true identities and the full scope

---

[1] *See* Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated-goods), at 10, 19.

and interworking of their illegal network. Despite deterrents such as takedowns and other measures, the use of aliases enables infringers to undermine the best efforts of authorities: *Id.* at 5, 11, 12.

31.     In a 2024 report by the Office of the United States Trade Representative (USTR) titled *2024 Review of Notorious Markets for Counterfeiting and Piracy*, counterfeit and pirated goods from China (including trans-shipments via Hong Kong) accounted for 84% of the value and 90% of the total quantity of counterfeit and pirated goods seized by U.S. Customs and Border Protection (CBP) in 2023. The report notes that in prior years, online piracy cost the U.S. economy an estimated $29.2 billion in lost revenue. The report also highlights how e-commerce and social media platforms facilitate counterfeit sales via online seller listings, influencer promotion, links to fake sites, and social media driven traffic.[2]

32.     Plaintiff has been and continues to be irreparably harmed through loss of control over its reputation, goodwill, ability to license, and the quality of goods featuring the NASCAR Trademarks.

33.     Plaintiff's investigation reveals that the telltale signs of an illegal counterfeiting and infringement scheme are present in the instant action. For example, Schedule A shows the use of store names by the Seller Aliases that employ abnormal business nomenclature and, instead, have the appearance of being entirely fabricated. If a company appears to be legitimate based on its name, research often shows that there is no physical address provided for the company. Thus, upon information and belief, the Seller Aliases are deliberately operating deceptive online storefronts specifically designed to mislead consumers by appearing to sell genuine NASCAR Products, while

---

[2] *See 2024 Review of Notorious Markets for Counterfeiting and Piracy*, 89 Fed. Reg. 66,754 (USTR Docket No. 2024-0013) (Oct. 2, 2024). 2024 Review of Notorious Markets for Counterfeiting and Piracy | U.S. Chamber of Commerce

knowingly selling unauthorized, inferior counterfeit imitations of Plaintiff's NASCAR Products that illegally use the NASCAR Trademarks.

34. Screenshot evidence showing each Defendant on Schedule A selling Infringing Products is attached as Exhibit 2. Exhibit 2 depicts the specific infringement by each Defendant on Schedule A, identifying in each instance the specific trademark infringed by each Defendant, the registration number for the infringed trademark, and a screenshot showing each alleged product listing in the same context in which it is presented to the consuming public.

35. The Infringing Products for sale through the Seller Aliases bear similarities and indicia of being related to one another, demonstrating that the Infringing Products were manufactured by and sourced from a coordinated network. Upon information and belief, Defendants constitute an organized group of infringers operating in deliberate concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Infringing Products.

36. The Seller Aliases intentionally conceal Defendants' identities and the full scope of their counterfeiting and infringement operations in effort to deter Plaintiff from determining Defendants' true identities and the exact interworking of Defendants' illegal operations. Defendants go to great lengths to conceal their identities by using multiple fictitious names and addresses to register and operate their massive network of Seller Aliases.

37. Upon information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Use of such Seller Alias registration patterns is one of many common tactics used by the Defendants to conceal their

identities and the full scope and interworking of their massive infringement operation and allow their unlawful marketplaces to avoid being shut down.

38. In addition to operating under multiple fictitious names, Defendants systematically employ tactics designed to circumvent intellectual property enforcement efforts and evade detection. For example, infringers such as Defendants will often register new online marketplace accounts under new aliases once they receive notice that a lawsuit has been filed.

39. Infringers also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection. A 2024 U.S. Customs and Border Protection report on seizure statistics indicated that the vast majority of Intellectual Property Rights (IPR) seizures continue to take place within the express consignment (expedited shipments by such carriers as Federal Express, DHL or UPS) and mail shipping methods. In 2024, 97% of IPR seizures in the cargo environment occurred in the de minimis shipments, that is, shipments valued at $800 or less. U.S. Customs and Border Protection, *Intellectual Property Rights Seizure Statistics FY 2024*.[3]

40. Further, infringers such as Defendants deliberately maintain a complex network of multiple credit card merchant accounts and third-party payment processing accounts, including, but not limited to, Amazon Pay and PayPal (collectively "Financial Accounts"), strategically concealed behind layers of payment gateways, specifically designed to evade transaction tracking, thus circumventing enforcement and allowing the infringers to continue their operations despite Plaintiff's enforcement efforts.

---

[3] *See* U.S. Customs & Border Protection, FY 2024 IPR Seizure Statistics, (Jan. 16, 2025). FY 2024 IPR Seizure Statistics | U.S. Customs and Border Protection

41. Upon information and belief, Defendants systematically maintain offshore bank accounts and deliberately transfer funds from their Financial Accounts to these offshore accounts where they are beyond the jurisdiction of U.S courts. This behavior demonstrates a calculated scheme to shield their illicit profits from legal enforcement and recovery.

42. Without any authorization or license from Plaintiff, Defendants have knowingly, willfully, and deliberately counterfeited Plaintiff's NASCAR Trademarks in connection with the systematic advertisement, distribution, offering for sale, and sale of Infringing Products into the United States, including within the Western District of North Carolina, over the Internet.

43. Each Seller Alias offers shipping to the United States, including North Carolina, and, on information and belief, each Defendant has offered to sell Infringing Products into the United States, including the Western District of North Carolina.

### Count I - Trademark Infringement - Counterfeit Products
**(15 U.S.C. § 1114)**

44. Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

45. Without NASCAR's authorization, the Defendants identified in Schedule A, attached, offer for sale products that bear NASCAR Trademarks.

46. Defendants sell products bearing NASCAR Trademarks to exploit the goodwill associated with those marks or to falsely suggest that NASCAR sponsors, endorses, or is otherwise affiliated with the counterfeit products, when in fact NASCAR does not.

47. Defendants' unauthorized use of the NASCAR Trademarks on or in connection with the Infringing Products was done with notice and full knowledge that such use was not authorized or licensed by NASCAR, and with deliberate intent to unjustly benefit from and damage

14

the substantial and incalculable goodwill NASCAR has developed in the NASCAR Trademarks through years of quality control and significant investment.

48.    Defendants' actions constitute willful counterfeiting of the NASCAR Trademarks in violation of 15 U.S.C. §§ 1114(1)(a)-(b), 1116(d), and 1117(b)-(c).

49.    Defendants' continued, knowing, and willful use of the NASCAR Trademarks without NASCAR's consent or authorization constitutes intentional infringement of the NASCAR Trademarks in violation of §32 of the Lanham Act, 15 U.S.C. § 1114.

## Count II - False Designation of Origin, Passing Off & Unfair Competition
### (15 U.S.C. § 1125(a)/Lanham Act § 43(a))

50.    Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

51.    Defendants' promotion, marketing, offering for sale, and sale of infringing NASCAR Products has created and is creating a likelihood of confusion, mistake, and deception among the public as to the affiliation, connection, or association with Plaintiff or the origin, sponsorship, or approval of Defendants' infringing products by Plaintiff.

52.    By using the NASCAR Trademarks in connection with the sale of unauthorized products, Defendants falsely designate the origin of their unauthorized goods, falsely representing that Plaintiff sponsors or endorses such Infringing Products when in fact Plaintiff does not.

53.    Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the unauthorized products to the general public is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

54.    Upon information and belief, Defendants' wrongful and unlawful actions alleged above have been undertaken knowingly, deliberately, willfully, and with the intent to cause confusion, to cause mistake, and to deceive the purchasing public, and undertaken with the intent

15

to trade on the goodwill and reputation of NASCAR, its NASCAR Products, and NASCAR Trademarks.

55. Plaintiff has no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of its brand.

### V. Prayer for Relief

WHEREFORE, Plaintiff prays for entry of a Judgment against Defendants, ordering and directing as follows:

1) That Defendants, their affiliates, subsidiaries, officers, directors, agents, servants, employees, attorneys, successors, assigns, and all persons acting for, with, by, through, under, or in active concert or participation with them, who receive actual notice of this Order, be temporarily, preliminarily, and permanently enjoined and restrained from:

a. using the NASCAR Trademarks or any reproductions, copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not an authorized NASCAR Product or is not authorized by Plaintiff to be sold in connection with the NASCAR Trademarks;

b. passing off, inducing, or enabling others to sell or pass off any product not produced under the authorization, control or supervision of Plaintiff and approved by Plaintiff for sale under the NASCAR Trademarks;

c. committing any acts calculated to cause consumers to believe that Defendants' Infringing NASCAR Products are those sold under the authorization, control or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

d. further infringing the NASCAR Trademarks and damaging Plaintiff's goodwill;

e. otherwise competing unfairly with Plaintiff in any manner;

16

f.  shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not authorized by Plaintiff to be sold or offered for sale, and which bear the NASCAR Trademarks;

g.  using, linking to, transferring, selling, exercising control over, or otherwise owning the Seller Aliases, or any other online marketplace account that is being used to sell products or inventory not authorized by Plaintiff which bear the NASCAR Trademarks or any confusingly similar marks;

2)  That Defendants, within fourteen (14) days after service of the Court's order granting injunctive relief with notice of entry thereof upon them, be required to file with the Court and serve upon Plaintiff a written report under oath setting forth in detail the manner and form in which Defendants have complied with all aspects of the injunctive relief ordered by this Court;

3)  Entry of an Order that, upon Plaintiff's written request, those in privity with Defendants and those with actual notice of the injunction, including any online marketplaces, social media platforms (including but not limited to Facebook, Instagram, YouTube, LinkedIn, and X (formerly Twitter)), internet search engines (such as Google, Bing, and Yahoo), web hosts for the Seller Aliases, domain name registrars, and online marketplace account registrars, shall:

a.  disable and cease providing services for any accounts through which Defendants engage in the sale of products not authorized by Plaintiff that bear the NASCAR Trademarks or any confusingly similar marks, including but not limited to any accounts associated with the Defendants listed on Schedule A and any affiliated, related, or successor accounts;

17

b. disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of products not authorized by Plaintiff that bear the NASCAR Trademarks; and

c. take all steps necessary to prevent links to the Seller Aliases identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Seller Aliases from any search index;

4)      That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' willful and unlawful acts herein alleged, and that Plaintiff recover its actual damages caused by Defendants' infringement, and that the Court, in its discretion, increase the damages award up to three times the amount found pursuant to 15 U.S.C. § 1117(a) due to the exceptional nature of this case and Defendants' willful infringement;

5) In the alternative to an award of actual damages and profits, that Plaintiff be awarded statutory damages of not less than $1,000 and not more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as provided by 15 U.S.C. § 1117(c)(1), or if the Court finds that the use of the counterfeit mark was willful, statutory damages of up to $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as provided by 15 U.S.C. § 1117(c)(2);

6) The Plaintiff be awarded its reasonable attorneys' fees and costs; and

7) Award such other and further relief, including temporary, preliminary and permanent injunctive relief, as this Court may deem just and proper under the circumstances and as allowed by law.

18

Date: July 24, 2026

Respectfully submitted,

*/s/ Eric L. Register*
Eric L. Register
North Carolina Bar No. 23449
**WHITEWOOD LAW PLLC**
5555 Glenridge Connector, Suite 200
Atlanta, GA 30342
Telephone: (404) 372-1155
Email: eregister@whitewoodlaw.com

*Counsel for Plaintiff*

## <u>Schedule A</u>

[REMOVED FROM PUBLIC DOCKET]